A02A2176. BALL v. BRIGHT HORIZONS CHILDREN CENTER, INC.
(578 SE2d 923)

BARNES, Judge.

Vanessa Ball sued Bright Horizons Children Center, Inc. as next friend and natural mother of M. C., a minor. Ball alleged that the day care center's teacher negligently supervised M. C.'s classroom, which proximately caused him injuries. Bright Horizons moved for summary judgment, which the trial court subsequently granted. Ball appeals, and after reviewing the entire record, we affirm the trial court's grant of summary judgment to Bright Horizons.

Ball alleges in her complaint that, "while in the care, custody, and control of defendants and employees of defendants, M. C. and T. S.," another boy in M. C.'s class, were allowed to remain unsupervised within a "fort" built of blocks inside their classroom.[1] M. C. was four and T. S. was six at the time. Ball further alleges that

---

[1] Ball also sued T. S.'s mother, but later dismissed her without prejudice.

T. S. "sexually abused" and committed sodomy on M. C. within that fort sometime during the period of July through December 1996. This negligent failure to supervise proximately caused M. C. "severe and excruciating mental pain and anguish," according to Ball's complaint. Ball further sought punitive damages against Bright Horizons, characterizing the center's actions as reckless and evincing conscious disregard for M. C.'s rights.

In its answer, Bright Horizons denied Ball's allegations and counterclaimed for slander. In its subsequent motion for summary judgment, Bright Horizons argued that it was not liable to Ball because it had no notice that there was a risk of such an occurrence, and because it is not an insurer against all possible hazards. Ball responded that Bright Horizons need not be on notice of a specific harm to be liable if that harm befalls one of the children in its care, and contended that Bright Horizons is liable for failing to properly supervise the two children, and in allowing them to build an enclosed structure in the classroom within which they could not be seen by staff. The trial court granted summary judgment to Bright Horizons, concluding that "[t]here is no evidence that the classroom was not supervised, that the children were not observed or that Bright Horizons personnel allowed the boys to wander off the premises. [Cit.] The evidence does not show the date of the incident or how long the incident lasted."

This court has reviewed the entire record in this case, which is almost 2,000 pages long and includes nine depositions, of Ball; M. C.'s counselor; T. S.'s father; T. S.'s mother, who was also the center's director at the time of the incident; the regular teacher of M. C. and T. S.'s class; a Cobb County detective with the Crimes Against Children Unit; plaintiff's expert in day care supervision; Bright Horizons' regional manager; and Bright Horizons' current director. There is no evidence in the record, by way of affidavit or deposition or anything else, directly from the two boys involved.

Ball testified that she picked up M. C. from day care in December 1996, and during the ride home he said that T. S. wanted to play the "suck weenie" game that day. M. C. said they did not play because he did not want to. M. C. had turned five the previous September, and T. S. was six. Ball pulled over to the side of the road, and upon being questioned more closely, M. C. said the game involved one person putting his mouth on the other person's penis. He began crying when he saw her reaction because, she said, he did not realize how bad or wrong the game was, and cried because he thought T. S. would be mad at him for telling and would not be his friend anymore.

In response to being asked when and where this happened, M. C. said it happened in summer, in class inside a fort they built out of large blocks, while the teacher was present in the classroom. Ball tes-

tified that apparently the boys played this game more than once, she thought it happened sometime between June and August 1996, she had never seen the "fort" M. C. described, and she did not know if any other children were present at the time. She removed him from the center after one more day of attendance, put him in counseling, and contacted a lawyer within a week. She further testified that he had been "absolutely, 100 percent normal" before this revelation, happy both in the mornings before school and after he came home from school.

The mother of T. S., Linda Stansbury, testified that Ball called her that evening and related the story. Stansbury said she talked to T. S. about it, and he said M. C. had asked T. S. to touch and suck M. C.'s weenie, and T. S. did so. He said it happened a long time ago when he was five, inside a house of blocks the two boys built at Bright Horizons, and did not say whether it happened once or more than once. T. S. also said a "mean boy in the neighborhood" told him to do that one day, but denied playing the game with this boy, who could never be identified. Stansbury testified that she explained to T. S. that this sort of behavior was inappropriate and unhygienic and made T. S. call Ball to apologize. T. S.'s father also testified that he talked to T. S. regarding the incident, that T. S. said M. C. asked him to suck his weenie, which he did, and that it happened one time.

Stansbury testified that she took T. S. to a health care professional the next day because she was concerned that he had been a victim, but was satisfied that the episode represented one occasion of exploratory play of a sexual nature. Such play involves children seeing, touching, and showing their private parts to each other. She also testified that exploratory play can occur even when children are properly supervised with an appropriate student-teacher ratio. The boys' classroom was licensed for 20 children in the summer of 1996, and enrollment was less than 20. Stansbury testified that it was impossible for a teacher to watch each child 100 percent of the time.

The classroom teacher testified that, during the summer of 1996, she and an assistant supervised M. C.'s class, which T. S. also attended. She could see all around the classroom, which was divided into play areas, and if there was something she could not see, she would move until she could see it. The only time she could not see the children was when they were in the bathroom. When asked to identify a picture of a block structure that was completely enclosed, the teacher testified that, while the classroom had an area for playing with large blocks, she had never seen a structure in her class like that pictured. She further testified that she would not have allowed such a structure to remain because the roof could have fallen and hurt the children and because she could not see them playing inside. She testified that she first learned of this incident the day after M. C.

told his mother about it in the car, but could never ascertain specifics about what happened, such as the time or date, or even whether the incident took place.

Plaintiff's expert witness testified concerning the standards of supervising young children. Dr. Linda Miller, who holds a doctorate in educational leadership, testified that one of the reasons a maximum ratio of students to teachers is allowed is to enable the teacher to supervise properly. Teachers need to position themselves within a classroom so that they can observe every child, even if they are in the process of assisting a particular child with something. While she did not know how long the incident between T. S. and M. C. took, whether the child's pants had been pulled down or unzipped, whether they could be seen or not, how high the block structure was or whether it had a top, where the teacher was or what she was doing, she testified that the supervision was negligent because one boy sucked another boy's penis and the teacher was unaware. Dr. Miller further testified that anytime a teacher loses view of the entire classroom, that is a problem and may be negligent supervision, and that here, the teacher should have been aware of the boys' activities.

The former regional director of Bright Horizons testified that children were more likely to become injured if they are unsupervised, but can also become injured while someone is supervising them. Because it is physically impossible to monitor all children by sight and sound in a classroom at all times, teachers should rotate through the class and check on the children frequently. A teacher should listen to the children carefully if they are playing inside an enclosed structure, and if they are happy and playing appropriately, she need not supervise them more closely than normal. The former regional director testified that the incident between M. C. and T. S. was not outside the norm for children of their ages, but was exploratory play of a sexual nature, which she defined as socially unacceptable behavior such as exposing, touching, or viewing each other's genitals, about which a child has no understanding. As with biting, pushing, or cursing, exploratory play of a sexual nature can happen in an instant even with a teacher physically present. Such an event can happen in an extremely short time in a class that is fully supervised. In this case, M. C.'s teacher had no memory of anything like this occurring in her class.

Finally, the regional director testified that she was concerned about Ball, and about her feelings surrounding this incident, because parents can have a very emotional reaction to two kinds of incidents: exploratory play of a sexual nature and biting. These two categories can be very shocking and frightening to parents, and while Ball

seemed satisfied after her conversation with the regional director, M. C. did not return to school.

The current Bright Horizons director also testified that sexual exploratory play is socially unacceptable behavior that is developmentally normal for children and could include one child sucking another child's penis. While it was important for a teacher to position herself so that she could supervise all the children by sight and sound, she would not always be able to see everything when, for example, she was tying a child's shoelace. If a classroom contained an enclosed block structure, she would expect a teacher to check on any children playing there every two or three minutes. When Ball notified the school about the incident, the director and other Bright Horizons staff members tried to figure out what had happened, but they had no information about which day or time of day or anything but a very general parameter of dates, because to a child "summertime" could mean anytime it was hot outside. As an expert day care director, she thought such an incident could occur even in a well-supervised room. She further opined that Ball was taking out of context something that could be normal developmental behavior, putting adult emotions into it and inappropriately viewing this sexual exploratory play in an adult sexual context. The director testified that the reaction of the adults involved will have a much longer-lasting impression on the children than the actual events themselves.

Ball asserts a claim for negligence against Bright Horizons and must therefore show that Bright Horizons owed a duty to M. C., that the day care breached that duty, and that M. C. suffered an injury resulting from the breach. *Bull Street Church of Christ v. Jensen*, 233 Ga. App. 96, 98-99 (1) (504 SE2d 1) (1998). In providing day care for M. C., Bright Horizons clearly had a duty to exercise reasonable care for his safety. Assuming for the sake of argument that M. C. suffered an injury, there is no evidence that this injury stemmed from a breach of Bright Horizons' duty.

The measure of Bright Horizons' duty of care for M. C.'s safety "is to be gauged by the standard of the average responsible parent; such person is not an insurer of the safety of the child and has no duty to foresee and guard against every possible hazard." (Citation and punctuation omitted.) *Laite v. Baxter*, 126 Ga. App. 743, 745-746 (2) (191 SE2d 531) (1972). A day care provider "has no duty to foresee and guard against every possible hazard." *La Petite Academy v. Turner*, 247 Ga. App. 360, 361-362 (543 SE2d 393) (2000); *Wallace v. Boys Club of Albany*, 211 Ga. App. 534, 535 (1) (439 SE2d 746) (1993).

Foreseeability can be an issue in negligent supervision cases, relating to whether the defendant breached its duty to the plaintiff.

For example, whether defendants exercised reasonable care of a high school student injured in a fight may depend on whether similar fights had broken out before in the same area and were instigated by the same person. *Watts v. Wayne County Bd. of Ed.*, 201 Ga. App. 777 (412 SE2d 541) (1991). In this case, however, the experts testified that children of this age are apt to injure each other if unsupervised, and therefore it was foreseeable that M. C. could be injured by another child while in day care.

Ball alleges that M. C.'s teacher breached her duty by failing to see M. C. and T. S. playing the "suck weenie" game. Even assuming, as we do for purposes of summary judgment, that the teacher failed to see the children while the game took place, it does not follow that Bright Horizons is liable for negligence. Ball contends that, if the teacher had been supervising properly, the game would not have taken place. Whether that is true, however, is mere speculation. Neither child discussed with his parents how long the incident took, and the teacher denied that the children built a block structure with a roof on it that she could not see into. The experts all agree that it is physically impossible to watch each child in a classroom 100 percent of the time, and the current director testified that exploratory play of this nature can take place in a flash, even with the teacher present and supervising properly. Without any parameters of time of day, place, date, length of play, or anything else delineating the facts, concluding that the teacher was negligent is pure speculation. "When the matter remains one of pure speculation or conjecture, it becomes the duty of the trial court to grant summary judgment for the defendants." (Punctuation omitted.) *La Petite Academy v. Turner*, supra at 363.

Despite the many depositions in the record, there is no evidence that the teacher did not exercise ordinary care in supervising M. C. when the incident took place. "In the absence of allegations of fact supporting the specifications of negligence as to inadequate supervision, they are mere conclusions of the pleader. Furthermore, there is no showing that proper supervision could have prevented the occurrence of such an injury." (Citation and emphasis omitted.) *Allen v. Crawford*, 211 Ga. App. 99, 101-102 (1) (b) (438 SE2d 178) (1993).

While Ball's expert, Dr. Miller, testified that, in her opinion, the fact that this incident occurred meant that M. C. was negligently supervised, the standard for recovery in Georgia is not compensation upon injury. Unlike the situation in *Holley v. Smallwood*, 174 Ga. App. 365 (330 SE2d 136) (1985), we do not unfavorably weigh Dr. Miller's testimony against the testimony of the three Bright Horizons employees; rather, we hold that her testimony that supervision was negligent because an injury occurred misstates the law in this state, which is that a day care provider is not the insurer of a child's safety.

The trial court did not err in granting summary judgment to Bright Horizons on Ball's negligent supervision claim.

*Judgment affirmed. Ruffin, P. J., concurs. Adams, J., concurs in the judgment only.*

DECIDED MARCH 11, 2003.

*James A. Shea, Jr.,* for appellant.

*Devlin & Robinson, Marvin A. Devlin, Chrisna J. Walker,* for appellee.